**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DANIELLE N. CAMPBELL,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **vs.** | * | **Civil Action No. 12-00656-B** |
| | * | |
| **CAROLYN W. COLVIN,**[1] | * | |
| **Commissioner of Social Security,** | * | |
| | * | |
| **Defendant.** | * | |

**ORDER**

      Plaintiff, Danielle N. Campbell (hereinafter "Plaintiff"), brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for a period of disability, disability insurance benefits, and supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401, *et seq.*, and 1381, *et seq.* On February 21, 2013, the parties consented to have the undersigned conduct any and all proceedings in this case. (Doc. 14). Thus, the action was referred to the undersigned to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. The parties waived oral argument in this case. (Doc. 23). Upon careful consideration of the administrative record and the memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner be **AFFIRMED**.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d), <u>Federal Rules of Civil Procedure</u>, Carolyn W. Colvin should be substituted for Michael J. Astrue as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## I.      **Procedural History**

Plaintiff filed applications for a period of disability, disability insurance benefits, and supplemental security income in June 2009.  (Tr.  115, 117).  Plaintiff alleges that she has been disabled since April 2007 due to degenerative disc disease, back spasms, depression, shoulder problems, and hyperventilation.  (Id. at 136, 140).  Plaintiff's applications were denied initially on August 19, 2009, and she timely filed a Request for Hearing before an Administrative Law Judge ("ALJ).  (Id. at 54-67, 71).  On October 21, 2010, Administrative Law Judge D. Burgess Stalley held an administrative hearing, which was attended by Plaintiff, her attorney, and a vocational expert ("VE").  (Id. at 34).  On November 17, 2010 the ALJ issued an unfavorable decision finding that Plaintiff is not disabled.  (Id. at 20-29).  Plaintiff's request for review was denied by the Appeals Council ("AC") on August 24, 2012.  (Id. at 1).  Thus, the ALJ's decision dated November 17, 2010,  became the final decision of the Commissioner.

Having exhausted her administrative remedies, Plaintiff timely filed the present civil action.  (Doc. 1).  The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.     **Issues on Appeal**

A.     Whether substantial evidence supports the ALJ's RFC assessment?

B.     Whether the ALJ erred in failing to resolve a conflict between the Dictionary of Titles and the Vocational Expert's testimony?

## III.    **Factual Background**

Plaintiff was born on March 4, 1978, and was thirty-two years of age at the time of her administrative hearing, which was conducted on October 21, 2010.  (Tr. 39, 136).  Plaintiff, who completed the tenth grade, has worked as a fast food cashier and as a babysitter.  (Id. at 39, 41).  According to Plaintiff, she last worked as a babysitter for approximately two years for three

children but stopped in May 2010 because the parents were no longer working and did not need a babysitter.  (Id. at 42).  Plaintiff testified that she is now precluded from performing any work because she can "hardly lift" her arm because of shoulder pain, and she has asthma, depression, and chronic back pain.  (Id.).  Plaintiff testified that she has received three injections for her shoulder pain, that she manages her anxiety/hyperventilation by going to a quiet place to sit until she can catch her breath, that her depression has improved since taking Wellbutrin, Abilify, and Ritalin, and that she takes Advair for asthma.  (Id. at 44, 46).  Plaintiff indicated that since she has been on Advair, her asthma has significantly improved.  (Id. at 48).

With respect to her daily activities, Plaintiff testified that she lives with her grandmother and her two children, that she can do basic chores, that she spends time reading to her children and helping them with their homework,[2] that she takes her children to the park, that she goes to PTA meetings, that she socializes with family, and that she and her grandmother take care of each other.  (Id. at 38, 46-47).   In her Function Report, Plaintiff further reported that she cares for and plays with her children; she prepares the family meals; she shops; she pays bills each month and maintains bank accounts; she irons, washes dishes and clothes, and she goes to church.  (Id. at 168-72).  Plaintiff also asserted that she can walk no more than fifty feet without having breathing difficulty and can lift no more than ten pounds.  (Id. at 173).

A.    **Standard of Review**

In reviewing claims brought under the Act, this Court's role is a limited one.  The Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence and 2) whether the correct legal standards were applied.[3]  Martin v.

---

[2] Plaintiff testified that she has two children, ages twelve and seven.  (Tr. at 46).

[3] This Court's review of the Commissioner's application of legal principles is plenary.  Walker v. Bowen, 826 F. 2d 996, 999 (11th Cir. 1987).

Sullivan, 894 F. 2d 1520, 1529 (11th Cir. 1990). A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Sewell v. Bowen, 792 F. 2d 1065, 1067 (11th Cir. 1986). The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Brown v. Sullivan, 921 F. 2d 1233, 1235 (11th Cir. 1991); Bloodsworth v. Heckler, 703 F. 2d 1233, 1239 (11th Cir. 1983) (holding that substantial evidence is defined as "more than a scintilla, but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable, as well as unfavorable, to the Commissioner's decision. Chester v. Bowen, 792 F. 2d 129, 131 (11th Cir. 1986); Short v. Apfel, 1999 U.S. Dist. LEXIS 10163, *4 (S.D. Ala. June 14, 1999).

B.    **Discussion**

An individual who applies for Social Security disability benefits must prove his or her disability. 20 C.F.R. §§ 404.1512, 416.912. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); see also 20 C.F.R. §§ 404.1505(a), 416.905(a). The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven his or her disability.[4] 20

_____

[4] The claimant must first prove that he or she has not engaged in substantial gainful activity. The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience. If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove an inability to

C.F.R. §§ 404.1520, 416.920.

In the case *sub judice*, the ALJ determined that Plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date of April 1, 2007, and that she has the severe impairments of history of depression, degenerative disc disease, history of back spasms, and problems with left shoulder. (Tr. at 22). The ALJ also found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments contained in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id. at 22-23).

The ALJ concluded that Plaintiff retained the residual functional capacity (hereinafter "RFC") to perform medium work, with the following limitations: she can never work around concentrated exposure to gases, fumes, dusts, and other pulmonary irritants; she can never reach overhead with her non-dominant left upper extremity; she can understand, remember and carry out very short and simple instructions; she can maintain attention and concentration for no more than two hour periods; and she must have infrequent contact with the general public and adapt to minimal changes in the work setting. (Id. at 24).

The ALJ then determined that Plaintiff is capable of performing her past relevant work (hereinafter "PRW") as a babysitter. (Id. at 27). In addition, relying on the testimony of the VE, the ALJ concluded that, in the alternative, considering Plaintiff's RFC and vocational factors,

---

perform their past relevant work. Jones v. Bowen, 810 F. 2d 1001, 1005 (11th Cir. 1986). In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history. Id. Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history. Sryock v. Heckler, 764 F. 2d 834, 836 (11th Cir. 1985). If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled. Jones v. Apfel, 190 F. 3d 1224, 1228 (11th Cir. 1999). See also Hale v. Bowen, 831 F. 2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

such as age, education and work experience, Plaintiff is able to perform other jobs existing in significant numbers in the national economy such as cafeteria attendant (DOT code 311.677-010, light, unskilled); microfilm document processor (DOT code 249.587-018, sedentary, unskilled); and production assembler (DOT code 706.687-010, light, unskilled). (Id. at 28). The ALJ thus concluded that Plaintiff is not disabled. (Id.).

## 1. **Medical Evidence**

The relevant medical evidence of record reflects that on August 23, 2005, when Plaintiff was twenty-seven years old, she sought treatment at the University of South Alabama Health Services for left shoulder pain. (Id. at 234). Plaintiff was examined by a certified registered nurse practitioner, Janet Russell, who noted a history of mild degenerative cervical disc disease and nerve impingement.[5] (Id. at 234, 239). Plaintiff reported that she had tried physical therapy, Flexeril, and NSAIDs for her shoulder pain, without much relief. (Id. at 234). Plaintiff's physical examination was normal, except for decreased range of motion in her shoulder and neck. She was in no acute distress. (Id.). Nurse Russell's findings were reviewed by Dr. Larry Henderson, who prescribed Ibuprofen, exercise, heat and ice, and a shoulder immobilizer for Plaintiff's left shoulder. (Id.).

Approximately a year and a half later, on March 21, 2007, Plaintiff sought treatment at the emergency room at Mobile Infirmary and reported right shoulder pain. (Id. at 212). Upon examination, the attending physician noted tenderness in Plaintiff's right shoulder. Otherwise, Plaintiff's examination was normal as it revealed full range of motion and no dislocation. (Id.).

---

[5] In November 2004, approximately two and a half years before Plaintiff's alleged onset date of April 2007, Plaintiff had an MRI of her cervical spine which showed "mild degenerative disc disease at C5-C6 with mild impingement of the thecal sac." (Tr. at 238). At that time, Plaintiff was experiencing left shoulder pain and upper back pain. (Id. at 238-39, 247). Dr. Barbara Corcoran diagnosed Plaintiff with "neuropathic pain secondary to compression of nerve" and anemia and prescribed Mobic and Neurontin. (Id. at 247).

X-rays of Plaintiff's right shoulder were normal and confirmed that there was no fracture or other abnormality.  (Id. at 214).  Plaintiff was given Darvocet and instructed to follow up with her primary care physician.  (Id. at 213).

Two days later, on March 23, 2007, Plaintiff sought treatment at the University of South Alabama Health Services for right shoulder pain.  Plaintiff reported that she had stopped working because of decreased mobility in her right shoulder.  (Id. at 233).  Plaintiff was examined by nurse Janet Russell, who noted that Plaintiff had been seen in the emergency room two days earlier, at which time an x-ray indicated no bony pathology.  (Id.).  Plaintiff's physical examination was unremarkable except that she was unable to reach her arms overhead or behind her back.  (Id.).  Nurse Russell's findings were reviewed by Dr. Carol Motley, who prescribed a Kenalog injection into the right shoulder, as well as Naprosyn and Flexeril.  She also instructed Plaintiff to do shoulder rehabilitation exercises and return in two weeks.  (Id.).

Six months later, on September 26, 2007, Plaintiff returned to the University of South Alabama Health Services and reported left shoulder pain and depression.  (Id. at 232).  Plaintiff was examined by Nurse Russell, who noted that Plaintiff had experienced a similar problem with her right shoulder six months earlier, for which she had been given an injection, exercises, and Naprosyn with some relief.  (Id.).  Plaintiff's physical examination was normal except that she was unable to reach her left arm over her head.  (Id.).  Nurse Russell's findings were reviewed by Dr. Carol Motley, who prescribed Paxil for depression and an injection and Naprosyn for Plaintiff's left shoulder.  Plaintiff was referred to physical therapy and to Mobile Mental Health for counseling.  (Id.).

Nine months later, on June 10, 2008, Plaintiff sought treatment from Dr. William Gewin at Diagnostic and Medical Clinic for shortness of breath and chest pain.  (Id. at 220-21).

Plaintiff's physical examination was normal, including her head, ears, eyes, nose, throat, lungs, heart, abdomen, and extremities. Dr. Gewin noted that Plaintiff was in no acute distress. (Id.). Dr. Gewin diagnosed Plaintiff with hyperventilation and possible asthma and ordered a chest x-ray and pulmonary function tests, the results of which were completely normal. (Id. at 220-22). He instructed Plaintiff to return in three weeks. (Id. at 221). Plaintiff returned on July 14, 2008, with complaints of shortness of breath and hyperventilation. (Id. at 218). Plaintiff's physical examination, including her heart and lung function, was normal, and she was in no acute distress. (Id.). Dr. Gewin diagnosed Plaintiff with hyperventilation and released her from his care with instructions on how to control her symptoms. (Id.).

On October 27, 2008, Plaintiff returned to the University of South Alabama Health Services and reported chronic fatigue. (Id. at 230, 281). Nurse Russell's examination of Plaintiff was normal and unremarkable. (Id. at 230). Her findings were reviewed by Dr. Motley, who prescribed Paxil for Plaintiff's fatigue, malaise, and hypersomnia and referred Plaintiff to AltaPointe for treatment and recommendations. (Id.).

Nine months later, on July 20, 2009, Plaintiff returned to the University of South Alabama Health Services and reported abdominal pain, chest pain/reflux, and depression. (Id. at 295). Plaintiff was prescribed Zegerid for reflux and Effexor for depression. (Id.). Plaintiff returned for a follow up examination on August 4, 2009. Nurse Russell noted significant improvement in Plaintiff's condition, and observed that Plaintiff's reflux symptoms had "improved quite a bit" and that, after taking Effexor for three weeks for depression, Plaintiff reported that she "can tell the difference" and that she "feel[s] better." (Id. at 292). The results of Nurse Russell's physical examination of Plaintiff were normal, and a CT scan of Plaintiff's abdomen was normal. (Id. at 292, 298, 347). Plaintiff was continued on her medications as

previously prescribed and was instructed to return in one year for her annual check up.  (Id. at 292).

On August 10, 2009, the Agency referred Plaintiff to Dr. John W. Davis, Ph.D., for a consultative psychological exam.  (Id. at 248).  At the time of the examination, Plaintiff was thirty-one years old, and Dr. Davis noted that her general appearance, dress, and behavior were appropriate and that there was nothing unusual about her gait, posture, mannerisms, or hygiene. (Id.).  Dr. Davis further noted that Plaintiff reflected "a good degree of self-sufficiency in her bathing, dressing, and feeding."  (Id.).   Plaintiff reported to Dr. Davis that she was applying for disability benefits because she "is unable to work due to shoulder problems, fatigue, anxiety attacks, inability to cope, and difficulty being around people."  (Id. at 249). Dr. Davis diagnosed Plaintiff with depression, NOS, and found her prognosis guarded, stating that, "[t]his claimant's mental state is a function of her general medical condition and is likely to improve or deteriorate, correlated with her general medical condition."  (Id.  at 252).  Dr. Davis further opined: "It is this examiner's opinion the claimant's ability to function in an age appropriate manner, cognitively, communicatively, adaptively, behaviorally, and socially is mildly to moderately impaired;" "[h]er capacity to show concentration, persistence, and pace in an age appropriate manner is mildly to moderately impaired;" her "ability to understand, carry out and remember instructions is mildly to moderately impaired;" her "capacity to respond appropriately to supervision, co-workers, and work pressures in a work setting is mildly to moderately impaired;" she "has the ability to do simple, routine, repetitive type tasks;" she "can get along with others;" and she "can manage any benefits that may be forthcoming."  (Id. at 252-53).   Dr. Davis concluded: "[t]he mental capacity of this claimant should be considered as an add-on factor but in and of itself is not disabling.  Decisions about her disability need to be based on the general medical condition

of this claimant." (Id. at 253).

The following day, on August 11, 2009, State Agency psychologist Dr. Linda Duke, Ph.D., reviewed Plaintiff's medical records and completed a Psychiatric Review Technique opining that Plaintiff has "depression NOS," which causes moderate limitations in the areas of maintaining social functioning and maintaining concentration, persistence or pace, mild limitations in Plaintiff's activities of daily living, and no episodes of decompensation. (Id. at 255, 258, 265). Dr. Duke also completed a Mental RFC Assessment, in which she opined that Plaintiff is "moderately" limited in five of the twenty functional categories (i.e., ability to understand and remember detailed instructions, ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods, and ability to interact appropriately with the general public). (Id. at 269-71). Dr. Duke opined that Plaintiff "has the ability to understand, remember, and carry out very short and simple instructions;" she "can maintain attention and concentration for two hour periods;" her "contact with the general public should be infrequent;" and "changes in work setting should be minimal." (Id. at 271).

On August 28, 2009, Plaintiff returned to the University of South Alabama Health Services with complaints of left shoulder pain. (Id. at 291). Plaintiff reported "somewhat diminished range of motion" and "difficulty raising her left arm to comb her hair," as well as difficulty staying awake during the day. (Id.). Plaintiff's physical examination was normal and unremarkable. (Id.). Nurse Russell noted that "[t]he patient is able to raise her left arm to shoulder level before feeling pain. Rotation of the shoulder exacerbates the pain. There are painful trigger points below the left scapula." (Id.). Nurse Russell concluded that Plaintiff had "left shoulder pain, probably related to bursitis" and "reports of chronic hypersomnolence" for which Plaintiff was prescribed Naproxen, exercise, and a sleep study. (Id.).

The following month, on September 30, 2009, and October 1, 2009, Plaintiff underwent a sleep study conducted by Dr. William Broughton at the Mobile Infirmary Sleep Disorder Center. Dr. Broughton diagnosed Plaintiff with idiopathic hypersomnia, restless legs syndrome, and primary snoring. She was prescribed Provigil for hypersomnia and Requip for restless legs syndrome.  (Id. at 274-75, 289).  Plaintiff subsequently reported that Requip was relieving her discomfort from the restless legs syndrome.  (Id. at 275).  Dr. Broughton concluded that Plaintiff has "only mild sleep disordered breathing," and he instructed her to return in one month.  (Id. at 277, 287-88).

On January 22, 2010, Plaintiff returned to the University of South Alabama Health Services with complaints of upper back pain and dyspnea with exertion.  (Id. at 279, 282). Plaintiff's examination by Nurse Russell was essentially normal.  (Id. at 282).  Ms. Russell's findings were reviewed by Dr. Motley who diagnosed Plaintiff with "mild intermittent asthma" and allergic rhinitis.  (Id. at 282).  Dr. Motley prescribed Flonase, Singulair, and Proair for Plaintiff's asthma, Flexeril and weight loss for her back pain. Plaintiff was instructed to return in one month.  (Id. at 279, 282).

On February 4, 2010, Plaintiff was assessed at AltaPointe by a psychiatrist, Dr. Farah Khan.  (Id. at 310).  Plaintiff reported that she had been taking Effexor since October 2009 and that it "gave her energy so that she was not in her bed all the time" and that her "irritability ha[d] improved considerably."  (Id.).  Plaintiff further reported that she had previously taken Paxil and that it had helped her as well.  (Id.).  Dr. Khan's examination of Plaintiff revealed that her general appearance was normal, although her mood was depressed and her affect was dysphoric; her thoughts were logical and coherent; her memory was unimpaired; her concentration and orientation were within normal limits; her intellect was average; and her vocabulary was good.

(Id. at 312).  Dr. Khan diagnosed Plaintiff with "major depressive disorder, recurrent, mild" and noted, "I discussed with Ms. Campbell that she did not seem to have a serious psychotic disorder, though [she] seemed to have depression and a personality disorder.  She was interested in being rendered disabled, though I indicated that with treatment and therapy her prognosis was good."  (Id. at 313).  Dr. Khan changed Plaintiff's prescription from Effexor to Wellbutrin and instructed her to return for a medication check in one month.  (Id.).

Two weeks later, on February 18, 2010, Plaintiff returned to AltaPointe for therapy and reported "no depressed mood."  (Id. at 314).  Her therapist noted that she was responsive, cooperative, coherent, that she demonstrated no problems with her thought organization or orientation, that she demonstrated insight and understanding into her illness, that her depressed mood had improved since taking Wellbutrin, that her feelings of sadness and hopelessness had improved, that her crying had been reduced, and that her sleep had improved.  (Id.).  The following month, Plaintiff again reported improved sleep and decreased crying spells.  (Id. at 374).  She stated that she had been feeling better and was not as depressed when she took her medication.  (Id.).  On April 29, 2010, Plaintiff again reported improved sleep and no depression.  (Id. at 372).  Likewise, on May 20, 2010, Plaintiff reported that the Wellbutrin "ha[d] helped alot with mood ups and downs," and she was "more functional and stable."  (Id. at 367).  Plaintiff's therapist noted that she "is feeling better and is noticing a big improvement on her current meds and has more energy and focus and can do things.  Says that 95% of the time she can maintain and participate in things . . . having more good days than bad days."  (Id. at 369).  On June 3, 2010, Plaintiff again reported increased sleep hours and decreased crying spells, although she stated that the pain in her back and shoulder exacerbated her depressed mood.  (Id. at 365).  Plaintiff reported that the medication had decreased the intensity of her depression and enabled

her to function.  (Id.).

On June 15, 2010, Plaintiff returned to the University of South Alabama Health Services and reported shoulder and neck pain, asthma, and sleep apnea.  (Id. at 343).  According to Plaintiff, the pain in her left shoulder had resumed two months earlier and massage and exercise "help[ed] a little bit."  (Id.).  Plaintiff's examination was essentially normal, except that she was positive for wheezing, and her left shoulder had decreased range of motion.  (Id. at 344-45).  Plaintiff was continued on her previous medications and it was recommended that she be referred to the sports medicine clinic for further evaluation for pain in her shoulder.  (Id.).  One week later, Plaintiff returned with complaints of depression, hypersomnolence (excessive sleeping), ADHD, and anxiety.  (Id. at 322).  Dr. Meredith Maxwell noted that Plaintiff had been taking Wellbutrin and that her symptoms were better.  (Id.).  Dr. Maxwell's physical examination of Plaintiff was essentially normal, and she diagnosed Plaintiff with probable anxiety attack and paresthesias[6] (numbness or tingling) in her arms and legs.  (Id.).  Dr. Maxwell recommended that Plaintiff continue Wellbutrin and that she return in the event of any acute changes in the paresthesias in her arms and legs.  (Id.).

The following month, on July 16, 2010, Plaintiff  was seen at the University of South Alabama Health Services for depression, fluctuating asthma symptoms, and pain in her left shoulder.  (Id. at 340).  Plaintiff's examination was normal, and she was continued her prescriptions for Wellbutrin, Singulair, and Nasonex.  (Id. at 341-42).  The following week, Plaintiff returned complaining of a headache.  (Id. at 321).  Plaintiff was examined by Dr. Heather Cannon, who diagnosed Plaintiff with a migraine headache.  Dr. Cannon gave Plaintiff

---

[6] Paresthesia refers to "a burning or prickling sensation that is usually felt in the hands, arms, legs, or feet, but can also occur in other parts of the body. The sensation, which happens without warning, is usually painless and described as tingling or numbness, skin crawling, or itching." See http://www.ninds.nih.gov/disorders/paresthesia/paresthesia.htm.

an injection of Toradol as well as a prescription for Esgic with instructions "to take if 1 Extra Strength Tylenol does not relieve this at home." (Id.). Dr. Cannon noted that "[a]t this point, I do not want to put her on prophylactic medication as Tylenol usually does relieve them." (Id.). The following week, Plaintiff returned to the University of South Alabama Health Services and reported left shoulder pain that was worse with movement but was relieved by Flexeril, Naproxen, and rest. (Id. at 337). Dr. Michael Linder's examination of Plaintiff was normal, except for reported pain in Plaintiff's upper extremities. (Id. at 337, 339). Dr. Linder diagnosed Plaintiff with osteoarthritis, localized, involving the shoulder region, and gave her an injection. (Id.).

On July 29, 2010, Plaintiff returned to AltaPointe for therapy and reported improved sleep and no excessive crying or depression. Plaintiff stated that she "doesn't cry a lot anymore and her depressive days are now three out of what used to be an almost daily depressive occurrence." (Id. at 363).

On August 2, 2010, Plaintiff was seen at the University of South Alabama Health Services with complaints of left shoulder pain, anxiety, and asthma. (Id. at 334). The results of Nurse Russell's examination were normal except for "mild" musculoskeletal pain with motion. (Id. at 336). Ms. Russell noted that Plaintiff's shoulder pain was relieved by exercise, heat, ice, and injection. She recommended that Plaintiff continue exercises for shoulder pain. Advair and ProAir were prescribed for Plaintiff's asthma, and Wellbutrin for her depression. (Id. at 334, 336). The following month, Plaintiff returned with complaints of back pain, anxiety, asthma, and sleep problems. (Id. at 331). Nurse Russell noted no evidence of unusual anxiety or depression. (Id. at 333). Plaintiff's physical examination was normal, except for tenderness and mildly reduced range of motion in her thoracic spine and left shoulder. (Id. at 332-33). Plaintiff

was instructed to continue taking her previously prescribed medications and to continue exercises and NSAIDS for her back and shoulder pain.  (Id. at 333).

On September 9, 2010, Plaintiff returned to AltaPointe for therapy.  (Id. at 361).  Plaintiff reported that Wellbutrin had significantly improved her sleep and decreased her depressive symptoms and crying spells.  (Id.).  Plaintiff stated that she had experienced no depressive symptoms in two weeks, which was unusual because she "used to be depressed almost everyday," and that she had less anxiety and better control of stressful problems and situations. (Id.).

On September 13, 2010, Plaintiff returned to the University of South Alabama Health Services with complaints of back pain aggravated by bending, lifting and lying but relieved by heat and over-the-counter Ibuprofen.  (Id. at 327).  Dr. Michael Linder noted that Plaintiff's examination was normal, except for "mild pain" with motion in the thoracic spine.  (Id. at  328). X-rays of Plaintiff's thoracic spine were normal.  (Id. at  349).  Dr. Linder diagnosed Plaintiff with "likely muscle spasm," for which he prescribed Flexeril and heat.  (Id. at 329).

On September 15, 2010, Plaintiff returned to AltaPointe for medication monitoring and reported that the Wellbutrin was "work[ing] pretty well."  (Id. at 357).  Plaintiff's therapist noted that, although Plaintiff still had mood swings, her appearance, affect, and behavior were normal and appropriate; her thoughts were logical and coherent; her insight and judgment were good; and her anxiety was only "mild."  (Id. at 357-58).  Plaintiff was continued on Wellbutrin and instructed to return in six weeks.  (Id. at 359).  This is the final treatment note in the record.

### 2. Issues

#### a. Whether substantial evidence supports the ALJ's RFC assessment?

Plaintiff asserts that the ALJ's RFC assessment that she can perform a reduced range of

medium work[7] is not supported by substantial evidence in this case and, further, that the ALJ erred in failing to develop a full and fair record by not ordering a consultative physical examination to determine her physical limitations. (Doc. 13 at 3). According to Plaintiff, the ALJ was required to obtain a consultative physical examination because there is no physical RFC assessment from a medical source in this case clarifying the limitations caused by her degenerative disc disease, back spasms, and problems with her left shoulder. (Id. at 5-6). The Commissioner counters that the ALJ's decision is supported by substantial medical evidence in the record even in the absence of an RFC assessment from a medical source. The Court agrees with Defendant and finds that Plaintiff's claim is without merit.

It is well established that a hearing before an ALJ in social security cases is inquisitorial and not adversarial. A claimant bears the burden of proving disability and of producing evidence in support of his claim, while the ALJ has "a basic duty to develop a full and fair record." Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003) (per curiam); see also Ingram v. Commissioner of Soc. Sec. Admin., 496 F.3d 1253, 1269 (11th Cir. 2007). This duty to develop the record exists whether or not the claimant is represented by counsel. Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995).

In fulfilling the duty to conduct a full and fair inquiry, the ALJ has the discretion to order a consultative examination where the record establishes that such is necessary to enable the ALJ to render a decision. Holladay v. Bowen, 848 F.2d 1206, 1210 (11th Cir. 1988). However, the

---

[7] As discussed above, the ALJ found that Plaintiff retained the RFC to perform medium work, with the following limitations: she can never work around concentrated exposure to gases, fumes, dusts, and other pulmonary irritants; she can never reach overhead with her non-dominant left upper extremity; she can understand, remember and carry out very short and simple instructions; she can maintain attention and concentration for no more than two hour periods; and she must have infrequent contact with the general public and adapt to minimal changes in the work setting. (Tr. at 24).

ALJ is not required to order an additional consultative examination where the record contains sufficient evidence to permit the ALJ's RFC determination. Good v. Astrue, 240 Fed. Appx. 399, 404 (11th Cir. 2007) (unpublished) ("the ALJ need not order an additional consultative examination where the record was sufficient for a decision."); see also Ingram, 496 F.3d at 1269 ("The administrative law judge has a duty to develop the record where appropriate but is not required to order a consultative examination as long as the record contains sufficient evidence for the administrative law judge to make an informed decision."). Further, "there must be a showing of prejudice before [the court] will find that the claimant's right to due process has been violated to such a degree that the case must be remanded to the Secretary for further development of the record." Brown, 44 F.3d at 935. In evaluating the necessity for a remand, the Court is guided by "whether the record reveals evidentiary gaps which result in unfairness or 'clear prejudice.'" Id. (citations omitted).

Residual functional capacity is a measure of what Plaintiff can do despite his or her credible limitations. See 20 C.F.R. § 404.1545. The responsibility for determining a plaintiff's RFC lies with the ALJ and is based on all of the evidence of record. See Phillips v. Barnhart, 357 F.3d 1232, 1238 (11th Cir. 2004) (ALJ has duty to assess the residual functional capacity on the basis of all the relevant credible evidence of record); 20 C.F.R. §§ 404.1546, 416.946 (responsibility for determining a claimant's residual functional capacity lies with the ALJ). See also Foxx v. Astrue, 2009 U.S. Dist. LEXIS 80307, *17, 2009 WL 2899048, *6 (S.D. Ala. Sept. 3, 2009) ("The RFC assessment must be based on all of the relevant evidence in the case such as: medical history, medical signs and laboratory findings, the effects of treatment, reports of daily activities, lay evidence, recorded observations, and medical source statements.") (citing SSR 96-8p, 1996 SSR LEXIS 5). Once that decision is made, the claimant bears the burden of

demonstrating that the ALJ's decision is not supported by substantial evidence. See Flynn v. Heckler, 768 F.2d 1273, 1274 (11th Cir. 1985). For the reasons that follow, Plaintiff has failed to meet that burden.

First, the Court rejects Plaintiff's contention that the ALJ's RFC assessment was not based on substantial evidence simply because the record was devoid of an RFC assessment by a medical source. "[T]he Eleventh Circuit has not set out a rule indicating that an RFC must be based on the assessment of a treating or examining physician in every case." Saunders v. Astrue, 2012 U.S. Dist. LEXIS 39571, *10, 2012 WL 997222, *4 (M.D. Ala. March 23, 2012). "The ALJ's RFC assessment may be supported by substantial evidence, even in the absence of an opinion from an examining medical source about Plaintiff's functional capacity." Id. at n.5 (citing Green v. Soc. Sec. Admin., 223 Fed. Appx. 915, 923 (11th Cir. 2007) (unpublished)).

In Green, the Eleventh Circuit affirmed the district court's finding that the ALJ's RFC assessment was supported by substantial evidence where the ALJ properly rejected the treating physician's opinion and formulated the plaintiff's RFC based on treatment records, without a physical capacities evaluation by any physician. Id., 223 Fed. Appx. at 922-24. The court held, "[a]lthough a claimant may provide a statement containing a physician's opinion of her remaining capabilities, the ALJ will evaluate such a statement in light of the other evidence presented and the ultimate determination of disability is reserved for the ALJ." Id., 223 Fed. Appx. at 923 (citing 20 CFR §§ 404.1513, 404.1527, 404.1545); see also Packer v. Astrue, 2013 U.S. Dist. LEXIS 20580, *7, 2013 WL 593497, *2 (S.D. Ala. February 14, 2013) (the fact that no treating or examining medical source submitted a physical capacities evaluation "does not, in and of itself, mean that there is no medical evidence, much less no 'substantial evidence,' to support the ALJ's decision."). Thus, Plaintiff's contention that the absence of a physical RFC

evaluation by a medical source means that the ALJ's RFC assessment is not based on substantial evidence is simply incorrect.

Second, having reviewed the record in the instant case in its entirety, the Court finds that the ALJ fulfilled her duty to develop a full and fair record. In reaching her decision, the ALJ detailed the medical evidence, and the other evidence of record, and noted that:

> In sum, the above residual functional capacity assessment is supported by the medical evidence of record, the medical opinions discussed above, the medical course of treatment established by the record, the claimant's activities of daily living, and the claimant's work history.

(Tr. 31).

The record before the ALJ contained the medical records from the doctors who treated Plaintiff for her severe physical impairments, those being, degenerative disc disease, back spasms, and problems with her shoulders. In addition, the record before the ALJ contained the report of consultative psychological examiner, Dr. John Davis, Ph.D., and the Psychiatric Review Technique and Mental RFC Assessment of reviewing State Agency psychologist, Dr. Linda Duke, Ph.D., with respect to Plaintiff's mental impairment, *i.e.*, depression. The record before the ALJ also contained Plaintiff's testimony at the administrative hearing. This evidence was sufficient to enable the ALJ to determine Plaintiff's RFC. Indeed, there is nothing in the record which indicates that Plaintiff's limitations exceed those in the RFC.

As discussed in detail above, while the medical evidence in this case shows that Plaintiff has a history of degenerative disc disease, back spasms, and problems with her shoulders,[8] it also shows that these conditions are not disabling. Plaintiff's medical records repeatedly reflect that she had essentially "normal" physical examinations following her complaints of back and

---

[8] The Court has considered the medical evidence related to both Plaintiff's left and right shoulder.

shoulder pain, with occasional mildly reduced range of motion or mild pain with movement. (Id. at 212, 232-33, 291, 328, 333, 336, 339, 343). Moreover, Plaintiff's treating physicians consistently noted that her pain was relieved with over-the-counter or prescription pain medication (without any indication of negative side effects), injection, heat, ice, exercise, massage, or rest. (Id. at 327, 334, 336-37, 343). In addition, x-rays of Plaintiff's right shoulder and spine showed no fractures or abnormalities. (Id. at 214, 349). Likewise, Plaintiff's medical records related to her treatment for depression show that her depressive symptoms improved significantly with medication therapy and counseling and that her depression, while severe, was not disabling. (Id. at 292, 310, 357, 361, 363, 365, 367). Plaintiff's medical records contain repeated notations by her treating physicians that the medication was working, that Plaintiff was feeling much better, that she was more functional and stable, that she had less depressive episodes, that her crying had been reduced, and that her sleep had improved. (Id. at 292, 314, 363, 365, 367, 372). Plaintiff's treating psychiatrist, Dr. Farah Khan, M.D., specifically noted that, while Plaintiff was interested in being rendered disabled, "with treatment and therapy her prognosis was good." (Id. at 313). In addition, consultative psychologist Dr. John Davis opined that Plaintiff's depression caused no more than mild to moderate impairments in her ability to function and that Plaintiff was capable of performing simple, routine, repetitive type tasks and getting along with others. (Id. at 252-53). Dr. Davis specifically concluded that Plaintiff's mental capacity "in and of itself is not disabling." (Id. at 253). Likewise, State Agency psychologist Dr. Duke opined that Plaintiff's depression caused no more than moderate limitations in the areas of maintaining social functioning and maintaining concentration, persistence, or pace and that Plaintiff had the ability to understand, remember, and carry out very

short and simple instructions and to maintain attention and concentration for two hour periods. (Id. at 255, 265, 271).

Thus, contrary to Plaintiff's argument, the undersigned finds that notwithstanding the absence of a physical RFC assessment by a medical source, Plaintiff's treatment records, as well as her activities of daily living (including caring for two school-age children and her grandmother, attending PTA meetings, socializing with family, shopping, paying bills, preparing family meals, ironing, washing dishes and clothes, and going to church), support the ALJ's RFC determination that she can perform a range of medium work. (Id. at 38, 46-47, 168-72). Accordingly, Plaintiff's claim that the ALJ's RFC assessment is not supported by substantial evidence is without merit.

### b. Whether the ALJ erred in failing to resolve a conflict between the Dictionary of Titles and the Vocational Expert's testimony?

Plaintiff next asserts that the ALJ erred in relying on the vocational expert's testimony that she could perform other work existing in significant numbers in the national economy. (Doc. 13 at 7). As discussed above, the ALJ found that Plaintiff has the RFC to perform medium work, provided that the job requires Plaintiff to understand, remember and carry out only "very short and simple instructions." (Tr. at 24). The ALJ concluded, based on the testimony of the vocational expert ("VE") at the administrative hearing, that Plaintiff is capable of performing her past relevant work as a babysitter and that this work does not require the performance of work related activities precluded by her RFC. (Id. at 27). In addition, the ALJ alternatively concluded, based on the testimony of the VE, that although Plaintiff is capable of performing her past relevant work, there are other jobs existing in the national economy that she is also able to perform, namely cafeteria attendant (DOT code 311.677-010, light, unskilled, GED reasoning

level of 2); microfilm document processor (DOT code 249.587-018, sedentary, unskilled, GED reasoning level of 3); and production assembler (DOT code 706.687-010, light, unskilled, GED reasoning level of 2). (Id. at 28). Based on these separate findings, the ALJ concluded that Plaintiff is not disabled. (Id.).

Plaintiff argues that the ALJ erred in finding that she could perform the jobs of cafeteria attendant, microfilm document processor, and production assembler because each of these jobs has a General Educational Development ("GED") reasoning level[9] of two or greater, which exceeds the ALJ's RFC limitation of "very short and simple instructions." According to Plaintiff, the "very short and simple instructions" limitation is consistent only with a GED reasoning level of one. (Doc. 13 at 7). Plaintiff's argument fails for several reasons.

First, Plaintiff's argument overlooks the fact that the ALJ found that she can perform her past relevant work, a finding which Plaintiff does not challenge. Because Plaintiff can perform her past relevant work, she is not disabled regardless of the ALJ's alternative finding that there are also other jobs in the national economy that she can perform. See Pinion v. Commissioner of Soc. Sec., 522 Fed. Appx. 580, 582 (11th Cir. 2013) (unpublished) ("A claimant who can

---

[9] The GED level of a given job represents "those aspects of education (formal and informal) which are required of the worker for satisfactory job performance. This is education of a general nature which does not have a recognized, fairly specific occupational objective. . . . The GED Scale is composed of three divisions: Reasoning Development, Mathematical Development, and Language Development." See DOT Appendix C, 1991 WL 688702. GED reasoning level 2 signifies the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving few concrete variables in or from standardized situations." Id. GED reasoning level 3 signifies the ability to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variable in or from standardized situations." Id. The Commissioner's rulings do not correlate GED levels with any particular skill level of work. See George v. Astrue, 2011 U.S. Dist. LEXIS 112854, *15 n.5, 2011 WL 4550131, 5 n.5 (S.D. Ala. 2011).

perform his past relevant work is not disabled.").  Thus, Plaintiff's claim fails for this reason alone.

Second, the ALJ did not err in relying on the VE's testimony that Plaintiff can also perform the jobs of cafeteria attendant and production assembler, both of which have a reasoning level of two.  (Id. at 28).  Contrary to Plaintiff's argument, she has not established that a conflict does, in fact, exist between the VE's testimony and the DOT.  "Most courts which have addressed this issue have held that the requirement of Reasoning Level 2 or 3 is not inconsistent with the ability to perform only simple tasks."  Riddle v. Colvin, 2013 U.S. Dist. LEXIS 178621, *16, 2013 WL 6772419, *6 (M.D. Ala. 2013) (quoting Hurtado v. Astrue, 2010 WL 1850261, *11 (S.D. Fla. 2010) (citing Miller v. Comm'r of Soc. Sec., 246 Fed. Appx. 660 (11th Cir. 2007) (unpublished) (no remand where VE identified reasoning level 3 jobs for plaintiff who could do only simple, routine and repetitive work)); see also George v. Astrue, 2011 U.S. Dist. LEXIS 112854, *16, 2011 WL 4550131, *5 (S.D. Ala. 2011) ("Several courts have concluded that jobs with a reasoning level of 2 are consistent with simple, unskilled work."); Anderson v. Astrue, 2011 U.S. Dist. LEXIS 97440, *18, 2011 WL 3843683, *5 (S.D. Ala. 2011) (no conflict between VE testimony and DOT where at least one of the jobs identified by VE had reasoning level of 2, and the plaintiff was limited to simple routine tasks involving no more than simple, short instructions).  In this case, even assuming that a job with a reasoning level of three exceeds the RFC for simple tasks, Plaintiff has failed to establish a conflict with respect to the jobs of cafeteria attendant (DOT code 311.677-010) and production assembler (DOT code 706.687-010), given that the level two reasoning requirement of these jobs is consistent with carrying out simple, one and two step tasks and instructions.

Further, even if an actual conflict does exist, SSR 00-4p requires only that the ALJ resolve an "apparent unresolved conflict." In Leigh v. Commissioner of Social Security, 496 F. Appx. 973, 975 (11th Cir. 2012) (unpublished), Plaintiff argued the existence of a conflict between the VE's testimony and the DOT based on a dispute over the reasoning level attached to "simple, routine, repetitive" instructions, as Plaintiff argues here. The Leigh court found no apparent inconsistency between the VE's opinion and the DOT because "the ALJ asked the VE if there were any inconsistencies between his opinion and the DOT, and the VE responded that there were not," and the claimant "did not offer any evidence controverting the VE's opinion, nor did she object to the opinion." Id. In the present case, as in Leigh, the ALJ asked the VE at the hearing, "has your testimony been consistent with the DOT?" to which the VE replied "Yes," and Plaintiff's counsel did not object to the opinion. (Tr. 52). Thus, as in Leigh, there was no apparent conflict for the ALJ to resolve.

"If no apparent conflict between the VE's testimony and the DOT are raised at the hearing, the ALJ is not required to address SSR 00-4p." Riddle, 2013 U.S. Dist. LEXIS 178621, *18, 2013 WL 6772419, *7 (M.D. Ala. 2013) (citing Gibson v. Astrue, 2010 WL 3655857, *15 (N.D. Ga. 2010)). Where, as here, Plaintiff's counsel did not identify any conflicts, "the ALJ need not independently corroborate the VE's testimony and should be able to rely on such testimony where no apparent conflict exists with the DOT." Id. (citing Brijbag v. Astrue, 2008 WL 276038, *2 (M.D. Fla. 2008) (citing cases); see also Dickson v. Commissioner of Soc. Sec., 2014 WL 582885, *5 (M.D. Fla. Feb. 13, 2014) ("SSR 00-4p does not require an ALJ to independently investigate whether a conflict exists[;] it simply requires that that ALJ ask the vocational expert if a conflict does exist, and if a conflict exists, then the ALJ must explain and resolve the conflict.").

Last, the Court finds the ALJ did not err in relying on the VE's testimony because, "in the Eleventh Circuit, the VE's testimony trumps any inconsistent provisions of the DOT." Riddle, 2013 U.S. Dist. LEXIS 178621, *19, 2013 WL 6772419, *7 (M.D. Ala. 2013) (citing Jones v. Apfel, 190 F.3d 1224, 1229-30 (11th Cir. 1994) ("[W]hen the VE's testimony conflicts with the DOT, the VE's testimony 'trumps' the DOT.").  Thus, for each of these reasons, Plaintiff's claim must fail.

## V.    Conclusion

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff's claim for a period of disability, disability insurance benefits, and supplemental security income be **AFFIRMED.**

**ORDERED** this **28th** day of **March, 2014.**

_/s/_  **SONJA F. BIVINS**
**UNITED STATES MAGISTRATE JUDGE**
